**Eugene F. TAGALA, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–3076.**

Court of Appeals of Alaska.

May 31, 1991.

---

Blair McCune, Asst. Public Defender, and John B. Salemi, Public Defender, Anchorage, for appellant.

Shelley K. Chaffin, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS, J., and ANDREWS, Superior Court Judge.*

## OPINION

COATS, Judge.

Eugene F. Tagala was convicted of murder in the first degree and tampering with physical evidence. AS 11.41.100(a)(1)(A) and AS 11.56.610(a)(1). He contends that Superior Court Judge James A. Hanson erred in denying his motion to suppress. In his motion to suppress, Tagala argued that statements which he made to the police should be inadmissible because the police failed to administer *Miranda*[1] warn-

ings, and did not honor his request for counsel. He also contends that his statements were involuntary. Tagala also challenges the state's use of the computer system to obtain the criminal records of prospective jurors. We affirm.

On October 2, 1988, David C. Stailey was shot and killed outside of the Baywatch Lounge in Homer. Witnesses informed the police that, just prior to the shooting, Stailey and Tagala were sitting together in the bar. Stailey left the bar a few minutes after Tagala. Moments later, gunshots were heard and Stailey came back into the lounge and fell to the floor. Witnesses also indicated that there was "bad blood" between the two men, prior assaults had occurred, and Tagala had previously stated that he carried a gun to protect himself from Stailey.

The Homer police tried unsuccessfully to locate Tagala throughout the night of October 2. They had information concerning the car he was driving. The next morning, a patrol officer saw the car. Sergeant Luther Christopher then spotted the car, made a u-turn, put on his overhead lights and pulled over the car which Tagala was driving. Two more police cars arrived, and the officers conducted a pat-down search of Tagala. After the officers conferred among themselves, they decided not to formally arrest Tagala and so informed him. Instead, they asked him to come to the police station and answer some questions. He agreed.

Tagala rode to the station in the front of a police car. He was not physically restrained. He entered the station house unaccompanied, and was directed to an interview room.

Officer Andrew Klamser interviewed Tagala for less than two hours. The interview was tape-recorded. At the start of the interrogation, Tagala was again informed that he was not under arrest and that he was "free to leave." Klamser did not give Tagala a *Miranda* warning. At

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) [hereinafter, *Miranda*].

some point, Tagala admitted that he shot Stailey. Later, he agreed to provide blood and urine samples. After the interview ended, Tagala accompanied police officers to look for the weapon he had discarded.[2] The police then dropped Tagala at a friend's house where he had been staying. The police kept the house where Tagala was staying under surveillance.

Later that afternoon, Christopher returned to the house and asked Tagala to come back to the station for a second interview. He agreed. Christopher drove him to the station and then interviewed him. This time Christopher informed Tagala of his rights under *Miranda.*

During both interviews, Tagala frequently alluded to the fact that he and Stailey were both in the business of selling drugs. At one point during the second interview, when the subject of drug sales came up again, Tagala asked to speak to an attorney:

> CHRISTOPHER: Okay, let's go over some of the ... things that you've talked about. You said that during the evening ... you were making your usual rounds, what do you mean, specifically, by "usual rounds"?
>
> TAGALA: I usually hit all the bars. And see if there's anything going on out there, taking care of transactions, or taking orders, more or less.
>
> CHRISTOPHER: Of drugs you mean?
>
> TAGALA: Yeah.
>
> CHRISTOPHER: Of the sales of drugs? Is that what [you're] talking about?
>
> TAGALA: Well, now I think we better, before we get into that there[,] I think I might have to talk to an attorney on that angle. I don't want this used against me.
>
> CHRISTOPHER: Of the sales of drugs you mean?
>
> TAGALA: Right.
>
> CHRISTOPHER: Okay.... [Y]ou spoke about the "future," what did you mean by the "future"?

After this exchange, the interview continued. At its conclusion, Tagala was arrested. On October 7, 1988, he was indicted for murder in the first degree and tampering with physical evidence.

Before trial, Tagala moved to suppress all of his statements to the police, claiming that they were obtained in violation of *Miranda.* The trial court denied the motion concerning the statements made in the first interview, finding that Tagala was not in custody during that interview. The court partially granted the motion in regard to the second interview, ordering any statements that Tagala made concerning the sale of drugs after he requested counsel to be suppressed. However, the court ruled that all of Tagala's other statements were admissible.

■ Tagala first argues that the trial judge erred in denying his motion to suppress the statements which he made to the police. The issues in a suppression motion involve mixed questions of law and fact. We will accept the trial court's factual findings unless they are clearly erroneous. We will make the ultimate determination, after independently reviewing the record, whether a confession was voluntary and whether the defendant waived his *Miranda* rights. *Giacomazzi v. State,* 633 P.2d 218, 222 (Alaska 1981); *Van Cleve v. State,* 649 P.2d 972, 976 (Alaska App.1982).

The trial court denied Tagala's motion to suppress his statements to Officer Klamser during the first interview. The court ruled that Tagala was not in custody at that time. The court essentially adopted Tagala's version of the facts, but specifically found that the police did not physically restrain Tagala, and that Tagala entered the station house unaccompanied by an officer. The court also found that the police specifically informed Tagala that he was not under arrest, that he was free to leave, and that he could choose not to talk about anything he did not wish to discuss.

2. The gun was not found in the location Tagala had indicated but was later discovered in the yard of a Homer residence.

Tagala argues that his motion to suppress should have been granted because the facts show he was in custody at the time of the initial interview, and the police failed to advise him of his rights under *Miranda.* The state contends that the police did not subject Tagala to custodial interrogation, so that he was not entitled to the procedural protections of *Miranda.*

 A court determines whether a person is in custody using an objective test—would a reasonable person believe that he or she was not free to leave. *Quick v. State,* 599 P.2d 712, 717 (Alaska 1979); *Hunter v. State,* 590 P.2d 888, 895 (Alaska 1979); *Thompson v. State,* 768 P.2d 127, 130 (Alaska App.1989); *Hampel v. State,* 706 P.2d 1173, 1178 (Alaska App. 1985). In applying this objective test, the court considers the events prior to, during and immediately after the interrogation. *Hunter,* 590 P.2d at 895; *Thompson,* 768 P.2d at 130. Courts do not require the police to give *Miranda* warnings for an investigative stop; however, if the initial stop ripens into "custody" for purposes of the fifth and sixth amendments, the police must administer the warnings. *Berkemer v. McCarty,* 468 U.S. 420, 440–43, 104 S.Ct. 3138, 3150–52, 82 L.Ed.2d 317 (1984); *Blake v. State,* 763 P.2d 511, 514–15 (Alaska App.1988).

The trial court relied on *Thompson* in determining that Tagala was not in custody at the time of the first interview. In *Thompson,* the defendant voluntarily agreed to come to the trooper office; he was told he was not under arrest and was free to leave. This court affirmed the trial court's denial of the motion to suppress.

Tagala argues that *Thompson* is distinguishable because the defendant there was "asked" to come to the station; he was clearly not in custody when he arrived. In contrast, Tagala contends that he was subject to a "felony stop" of his vehicle so that the interrogation was a continuation of the initial seizure.

Tagala claims that two earlier cases, *Lowry* and *Hampel,* are more closely on point in this case. *Lowry v. State,* 707 P.2d 280 (Alaska App.1985); *Hampel v.*

*State,* 706 P.2d 1173 (Alaska App.1985). In *Hampel,* the defendant's vehicle was stopped pursuant to a homicide investigation. With guns drawn, the police conducted a pat-down search of the defendant and placed him in a patrol car. During a three-hour interrogation, the defendant was never left alone. Despite the fact that he was told he was not under arrest, this court concluded that a reasonable person would have believed that he was not free to leave and therefore, he was in custody during the interrogation. *Hampel,* 706 P.2d at 1178–79.

In *Lowry,* the defendant was also a suspect in a homicide investigation. In determining that he was not in custody during police questioning, the court stressed the fact that an officer initially telephoned Lowry, and Lowry agreed to meet with them. Before any show of force was used, the defendant indicated a predisposition to being interviewed. *Lowry,* 707 P.2d at 284.

 There is little question that Tagala was detained during the initial investigative stop. However, "a temporary stop cannot be equated with a formal arrest, even when considerable force is used in effectuating the stop." *Id.* at 283 (citation omitted). Tagala argues that the circumstances of that initial stop—the use of overhead lights, the presence of several police cars and officers and the request to come to the station for questioning—would have led a reasonable person to believe that he was in custody. Indeed, this court has expressed concern that such circumstances might convince a detainee that he or she is in custody despite assurances to the contrary.

In such a case, there will be a significant risk that the detained person's consent to a station house interview stems not from any genuine desire to be interviewed but rather from the impression that refusal to consent would be futile—that custody already exists and there is no power to decline the request for a trip to the station. The risk of a consent so tainted can be obviated by expressly informing the detained person, before asking for consent to a station house interview, that

the stop is a temporary investigative measure and that the person is, or shortly will be, free to go. Alternatively, the risk may be avoided when other attendant circumstances make the temporary nature of the stop reasonably apparent. *Id.* at 284.

In this case, the other attendant circumstances were sufficient for the trial court to find that the defendant was not in custody. The police used a minimal amount of force in the initial stop and no guns were drawn. The police repeatedly assured Tagala that he was free to leave and that he was not under arrest. Tagala voluntarily agreed to come to the station. He rode in the front of the police car and walked, unaccompanied, into the station. He was never physically restrained, and left at the end of the interview. We conclude that the trial court could properly find that Tagala was not in custody during the first interview, and we affirm the trial court's ruling.

Later in the day of October 3, 1988, Sergeant Christopher returned to the house where Tagala was staying. He drove Tagala back to the station for a second interview. At the start of the interview, Christopher read Tagala his *Miranda* rights. As we have previously pointed out in more detail, Tagala invoked his right to counsel at one point when the subject of drug sales came up again. The trial court apparently found that Tagala's statement was a limited invocation, applying only to questions concerning drug sales. The court suppressed any statements made after the request for an attorney, "which might tend to incriminate the defendant for illegal drug transactions."

The state argues that Tagala was not in custody during the second interview. The state contends that the mere reading of *Miranda* warnings does not indicate custody; instead, the court must independently determine whether custody existed from the "totality of circumstances." The state alternatively argues that, even if Tagala was in custody at that time, his request for counsel was only a limited assertion of his rights under *Miranda*. The state contends that in that case, the court's order, suppressing only those statements relating to Tagala's request, was the proper remedy.

We will assume, for purposes of this case, that Tagala was in police custody during the second interview. The general rule is that once an individual invokes his right to counsel, the police must terminate all further questioning unless counsel is present or the defendant initiates discussion. *Arizona v. Roberson,* 486 U.S. 675, 677, 108 S.Ct. 2093, 2096, 100 L.Ed.2d 704 (1988); *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). When the assertion of the right is ambiguous or equivocal, the police may ask questions to clarify the defendant's request. However, they may not ask anything other than clarifying questions. *Smith v. Endell,* 860 F.2d 1528, 1533 (9th Cir.1988); *United States v. Fouche,* 776 F.2d 1398, 1405 (9th Cir.1985). A defendant may also make a limited assertion of the right to counsel. A limited assertion exists when a defendant requests the assistance of counsel only on one subject and not another, or agrees to talk only about certain issues. *United States v. Eaton,* 890 F.2d 511, 513–14 (1st Cir.1989); *Bruni v. Lewis,* 847 F.2d 561, 563–64 (9th Cir.1988). While this court accepts the factual findings of the trial court (such as the resolution of any testimonial conflicts), the ultimate determination of the type of invocation that occurred and whether there was a waiver of rights requires independent review. "The constitutional effect of the dialogue is a legal question subject to our independent review." *Smith,* 860 F.2d at 1532 n. 3. *See also Connecticut v. Barrett,* 479 U.S. 523, 527 n. 1, 107 S.Ct. 828, 831 n. 1, 93 L.Ed.2d 920 (1987).

Tagala's initial request for counsel may have been ambiguous. However, when Christopher attempted to clarify his intention, Tagala did not equivocate.

TAGALA: I think I might have to talk to an attorney on that angle. I don't want this used against me.

CHRISTOPHER: Of the sales of drugs you mean?

TAGALA: Right.

A defendant may make an unambiguous but limited assertion of the right to counsel; the police then must restrict their questioning to matters outside the scope of the assertion. Any subsequent statements concerning the specific subject matter should be suppressed at trial. *Barrett*, 479 U.S. at 529, 107 S.Ct. at 832. Only ambiguous requests need to be interpreted broadly. *Id.* at 529–30, 107 S.Ct. at 832–33. In *Mallott v. State*, 608 P.2d 737, 742–43 (Alaska 1980), the court held that the defendant made a limited request for counsel concerning a breathalyzer test, but his assertion did not prohibit the police from otherwise questioning him. *See also Eaton*, 890 F.2d at 513–14 (defendant asserted right to remain silent in regards to some questions but not others).

Tagala's request was limited to a specific subject matter—the sale of drugs. It was not ambiguous. Subsequent to a limited request, only questions regarding that subject matter must cease. The trial court's order reflects that requirement.[3]

This court makes an independent determination whether a confession is voluntary based on the totality of circumstances. *Thompson*, 768 P.2d at 131; *State v. Ridgely*, 732 P.2d 550, 554 (Alaska 1987). The question for this court is whether Tagala's will was overcome by coercive police conduct. The factors to be considered include:

(1) age, mentality, and prior criminal experience; (2) length, intensity, and frequency of interrogation; (3) the existence of physical deprivation or mistreatment; and (4) the existence of threat or inducement.

*Thompson*, 768 P.2d at 131 (citation omitted).

Tagala argues that his confession was involuntary because the police were aware that he was extremely upset and frightened and used "psychological ploys" to coerce his statements. Additionally, the first interview was lengthy and he had consumed drugs during the previous night. The state counters that Tagala appeared calm and alert during the interview, and that similar tactics were approved in *Thompson.*

Tagala is not a newcomer to the criminal justice system. He is forty-six years old with an extensive criminal background. He does not appear to have below-average intelligence. The interview was not especially lengthy or coercive. He was not restrained nor deprived. The police tactics used seemed primarily to involve expressions of understanding and concern that he had acted in self defense. Such tactics are not improper. *See Thompson*, 768 P.2d at 131. We conclude that the trial court could properly find that Tagala's confession was voluntary. The trial court

---

**3.** Tagala also relies on *Smith v. Endell*, 860 F.2d 1528 in support of his position that all of his statements should have been suppressed after he requested counsel. The state distinguishes *Smith* because that case involved a "conditional" invocation as opposed to a "limited" invocation. Whether or not a conditional invocation is the functional equivalent of a limited request, *Smith* is not helpful in this case. In *Smith*, the Ninth Circuit held that all questioning should cease when an unambiguous conditional request is made, and the police are aware that the condition has been satisfied. *Id.* at 1531. The facts in *Smith* are that while being questioned about drug possession, the defendant asserted his right to an attorney if they were "looking at [him] as a suspect." *Id.* at 1529. Because he was, in fact, a suspect in the homicide investigation, the majority of the court found that the condition had been satisfied and the interrogation should have terminated. This case differs significantly from the case before the court in *Smith*. First, there was no "condition" to be satisfied in Tagala's request for counsel. He simply asserted his right not to discuss drug sales, whether or not there was a pending investigation or charges were to be filed. Second, in *Smith*, the state sought to admit the defendant's statements in his trial for murder—the exact issue for which he wanted the assistance of an attorney. In this case, Tagala was tried for murder, which he had been willing to discuss with the police. His statements concerning the protected subject matter—drug sales—could be excised from the recording, and the state did not introduce them at trial. A fair reading of Tagala's statement shows that the police were only interested in Tagala's drug dealing to the extent that it explained the homicide. After Tagala's limited invocation of his rights, the police continued to appear interested only in the homicide, and any questions which covered drug dealing were incidental to the homicide.

did not err in denying Tagala's motion to suppress.

■ Tagala next argues that the trial judge erred in denying his motion for a mistrial. After a prospective juror was arrested on an outstanding traffic warrant, defense counsel asked if the prosecutor had run criminal background checks on the others. The prosecutor admitted that the police had obtained print-outs and shared some of the information with her. It turned out that the police had run computer checks on at least twenty-six prospective jurors. Defense counsel argued that it was unlawful for the state to use the computer system in this manner, and moved for a mistrial. The court ruled that the use was proper under the relevant laws, and denied the defense motion.

Tagala argues that the state's use of the computer system violates AS 12.62.030(a) and the corresponding regulations. Alaska Statute 12.62.030(a) provides in part:

> Except as provided in (b) and (c) of this section and in AS 12.62.035, access to specified classes of criminal justice information in criminal justice information systems is available only to individual law enforcement agencies according to the specific needs of the agency under regulations adopted by the commission under AS 12.62.010. Criminal justice information may be used only for law enforcement purposes or for those additional lawful purposes necessary to the proper enforcement or administration of other provisions of law as the commission may prescribe by regulations adopted under AS 12.62.010.

The relevant regulations, 6 AAC 60.010 *et seq.*, govern the access, use and dissemination of criminal justice information.

Tagala argues that the plain language of the statute—"[c]riminal justice information may be used only for law enforcement purposes"—demonstrates that the state's use of the system was unlawful. He argues that jury selection is not a law enforcement purpose because it does not involve crime prevention or control. Alternatively, he argues that all of the relevant statutes, construed together, demonstrate a concern to protect the privacy and security of private citizens, like prospective jurors.

The state responds that the prosecutor's use of the computer system for jury selection was a "lawful purpose necessary to administration." Because the prosecutor can challenge jurors under Alaska Criminal Rule 24(c)(11)(ii),[4] she can lawfully obtain the necessary information to make those challenges.

Apparently, it is a common practice, in Alaska and other states, for the prosecutor to run criminal record checks on prospective jurors. Professor LaFave notes that such record checks, even when coupled with police investigation of the prospective jurors, are frequently challenged but rarely successful. LaFave, 2 *Criminal Procedure* § 21.3(b) at 725 (1984). This seems to be the first time the issue has been raised in this state.

Tagala relies on *State v. Bessenecker*, 404 N.W.2d 134 (Iowa 1987), in support of his argument. In that case, the Iowa Supreme Court held that the state must seek a court order before obtaining computerized criminal justice information on prospective jurors. *Id.* at 139.

However, in most cases, courts have upheld the practice. *See United States v. Falange*, 426 F.2d 930 (2nd Cir.1970); *People v. Murtishaw*, 29 Cal.3d 733, 175 Cal. Rptr. 738, 631 P.2d 446 (1981); *People v.*

---

**4.** Alaska Criminal Rule 24(c)(11)(ii) reads:

(c) *Challenges for Cause.* After the examination of prospective jurors is completed and before any juror is sworn, the parties may challenge any juror for cause. A juror challenged for cause may be directed to answer every question pertinent to the inquiry. Every challenge for cause shall be determined by the court. The following are grounds for challenges for cause:

. . . .

(11) That the person within the previous two years:

. . . . .

(ii) has complained against or been accused by the challenging party or attorney in a criminal prosecution.

*Aldridge,* 47 Mich.App. 639, 209 N.W.2d 796 (1973); *Losavio v. Mayber,* 178 Colo. 184, 496 P.2d 1032 (1972); *Commonwealth v. Smith,* 350 Mass. 600, 215 N.E.2d 897 (1966).

Under AS 12.62.030, it appears that a prosecutor may use the computer systems to obtain criminal justice information for "law enforcement purposes or any other lawful purpose necessary for administration." Alaska Statute 12.62.070(6) provides:

> "law enforcement" means any activity relating to crime prevention, control, or reduction or the enforcement of criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to apprehend criminals, activities of criminal prosecution, courts, public defender, corrections, probation or parole authorities....

Since the criminal record of a prospective juror is relevant for the use of challenges for cause, we conclude that the prosecutor did not violate the statute.

Tagala also argues that the state should have turned over the criminal records to defense counsel under Alaska Criminal Rule 16(b)(3). *See Losavio,* 496 P.2d at 1035 (juror information discoverable under Rule 16); Uniform Rules of Criminal Procedure (Supp.1987), 10 U.L.A.Rule 421 at 51 ("reports on prospective jurors" discoverable).

The state argues that defense counsel is not entitled to the information under Criminal Rule 16(b)(3). Alternatively, the state argues that, even if he was entitled to it, Tagala failed to request the information or demonstrate that he could not obtain it elsewhere. The state contends the court did not err in denying Tagala's motion for a mistrial.

A number of courts have held that the prosecuting attorney should disclose the criminal records of prospective jurors under a principle of fundamental fairness.

*See Bessenecker,* 404 N.W.2d at 134; *Murtishaw,* 631 P.2d at 465; *Aldridge,* 209 N.W.2d at 800–02;[5] *Losavio,* 496 P.2d at 1034–35. *But see Falange,* 426 F.2d at 933; *People v. McIntosh,* 400 Mich. 1, 252 N.W.2d 779 (1977); *Monahan v. State,* 294 So.2d 401, 402 (Fla. Dist.Ct.App.1974). In *Aldridge,* 209 N.W.2d at 801, the court stated:

> Our sense of fundamental fairness requires placing defendant upon an equal footing by requiring disclosure of the prosecutor's investigatory report upon prospective jurors. Since jurors are so important to our system of criminal justice, nondisclosure of information upon which defendant may exercise peremptory challenges places a premium on "gamesmanship" to the subversion of the trial's search for truth.

In another case, the court found that disclosure was required to combat inequality and unfairness in the criminal process. *See Murtishaw,* 631 P.2d at 465.

Criminal Rule 16 does not specifically provide for discovery of this information. However, the rule does promote expansive discovery in criminal cases. "*Scope of Discovery....* [D]iscovery prior to trial should be as full and free as possible consistent with protection of persons, effective law enforcement, and the adversary system." *See also DesJardins v. State,* 551 P.2d 181, 188 (Alaska 1976) (Rule 16 designed to further discovery in order to eliminate jockeying for tactical advantage); II *Standards for Criminal Justice* § 11–1.1 and commentary (1982 Supp.) (advocating full and free discovery). Moreover, Criminal Rule 16(b)(7) provides:

> *Other Information.* Upon a reasonable request showing materiality to the preparation of the defense, the court in its discretion may require disclosure to defense counsel of relevant material and information not covered by subsections (b)(1), (b)(2), (b)(3), and (b)(6).

---

**5.** *Aldridge* was limited by *People v. McIntosh,* 400 Mich. 1, 252 N.W.2d 779 (1977). The *McIntosh* court held that a court rule should be proposed dealing with this issue. *Id.* 252 N.W.2d at 782. Until that time, the prosecution need not share information concerning the jury with the defense, so long as that information is "reasonably available to the defense from other sources." *Id.*

Given the scope of this provision, we believe that the prosecutor should disclose to the defense, upon request, criminal records of jurors, at least in cases where the prosecution intends to rely on them. If the state is entitled to examine criminal records of jurors for jury selection, it is fair for the defense to have access to the same information.[6]

■ In this case, Tagala did argue before the trial court that he should have been given equal access to prospective jurors' criminal records. However, he failed to specifically request that the prosecutor turn over those materials or suggest other methods to cure the error. Nothing prevented Tagala from asking the jurors about their criminal records. It is difficult to say how he was harmed by the fact that he did not have access to the prosecutor's report. We conclude that Judge Hanson did not err in refusing to grant the severe remedy of a mistrial. Tagala never requested a less severe remedy. We therefore conclude Judge Hanson did not err in denying the mistrial motion.

The conviction is AFFIRMED.

---

6. We do not mean for the opinion to necessarily be the final word concerning the prosecutor's access to criminal background information concerning potential jurors, and defense access to that information. It appears that this may be a fruitful topic for the criminal rules committee to address.